**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Jerry Dale Riggins §<br><br>    *Plaintiff,* §<br> §<br>  v. §<br> §<br>United States Department of Defense; Lloyd J. Austin §<br>III, in his official capacity as United States Secretary §<br>of Defense; Christine Wormuth, in her official §<br>capacity as United States Secretary of the Army; and §<br>Army Board for the Correction of Military Records, §<br> §<br>    *Defendants.* § | CASE NO. |

## COMPLAINT

Pursuant to the Constitution and laws of the United States and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, Plaintiff Jerry Dale Riggins ("Plaintiff") respectfully submits this Complaint seeking relief from the unjust and erroneous final determination of the United States Army ("Army") and the United States Army Board for Correction of Military Records' ("Board") regarding his medical and discharge status.

## INTRODUCTION

1.      Plaintiff is a disabled veteran living with documented Major Depressive Disorder ("MDD") resulting from, and exacerbated by, his experiences as a wheeled vehicle repairer in the United States Army.

2.      Plaintiff's MDD resulted in the premature end of his military career when he was administratively separated from the Army on January 23, 1992. The Army documented the reason for his separation as "personality disorder," despite there being (a) no evidence consistent with the diagnostic criteria for personality disorder; and (b) ample evidence that Plaintiff suffered from MDD, including a suicidal gesture. Because Plaintiff was actually suffering from MDD, he was entitled to consideration by a Medical Examination Board ("MEB") and a Physical Evaluation

Board ("PEB"), which would have medically retired Plaintiff under AR 635-40 and §1201 of Title 10 of the United States Code instead of administratively separating him.

3.  Plaintiff is one of thousands of service members caught up in the military's use of "personality disorder" as a catch-all discharge excuse in violation of Department of Defense instructions, the services' own regulations, and prevailing medical and scientific standards.

4.  The evidence available at the time of Plaintiff's discharge, corroborated by evidence from his post-service treatment, shows that Plaintiff actually suffered from MDD, not a personality disorder, and thus should have been medically retired rather than administratively separated.  Furthermore, there are no "appropriate counseling or personnel records" for Plaintiff between his separation counseling and his administrative separation showing that he was "afforded ample opportunity to overcome these deficiencies" as required by AR 635-200.

5.  To rectify this error, Plaintiff applied to the Army Board for Correction of Military Records ("Board") for a correction of his military record to reflect that he was unfit for continued service and permanently medically retired for service-connected MDD with a 70% disability rating.  Plaintiff submitted this application in February 2019.

6.  The Board took nearly three years to communicate *any* information to Mr. Riggins, and when it did, it was to announce, in a letter to Plaintiff, that the Board was referring the application to the Surgeon General for further review.  Three months after that letter, the Board simply forwarded to Plaintiff the Surgeon General's report, which contained a recommendation unfavorable to Plaintiff.

7.  Plaintiff was given no opportunity to participate in or respond to the Surgeon General's opinion.  Nor did the Board review the Surgeon General's opinion to make its own determination.  Instead, the Board took its final agency by forwarding the Surgeon General's

Opinion and thereby adopting it as its Final Decision.  In this way, the Board arbitrarily, capriciously, and unlawfully abdicated its responsibilities and failed to correct Plaintiff's record as the law and substantial evidence requires.

8.     Plaintiff brings this action under the APA to set aside the final decision issued by the Board that declined Plaintiff's application for relief.

9.     The Board acted arbitrary, capriciously, and contrarily to law when it abdicated its responsibility to correct Plaintiff's record by uncritically accepting the erroneous recommendation of the Surgeon General that Plaintiff's military record not be corrected to reflect his separation being due to his MDD, not personality disorder.  In so doing, the Board failed to implement the rights and procedures that the Board's own regulations mandate that the Board provide to Plaintiff.

10.    The failures of the Board have deprived Plaintiff of the medical retirement status to which he is and has been entitled since his separation from the Army.  This deprivation includes the loss of substantial non-monetary benefits that Plaintiff earned through his honorable service that would have been available to him if he held retiree status, including TRICARE health insurance for life.

## **PARTIES**

11.    Plaintiff SPC Jerry Dale Riggins is a citizen of the United States, a veteran of the Army, and a resident of Hawaii.

12.    Defendant United States Department of Defense ("DoD"), headquartered at 1000 Defense Pentagon, Washington, D.C. 20301-1000, is a department of the Executive Branch of the United States Government.  The Department of Defense is an agency of the United States under the Administrative Procedure Act, 5 USC §701(b)(1).

13.     Defendant Lloyd J. Austin III is the United States Secretary of Defense.  Secretary Austin is the chief officer of the DoD and exercises authority, direction, and control over the DoD and the Army Board for Correction of Military Records.  Secretary Austin's official duties are conducted at 1000 Defense Pentagon, Washington, D.C. 20301-1000.

14.     Defendant Christine Wormuth is the United States Secretary of the Army.  She is the chief officer of the Army and exercises authority, direction, and control of the Army.  Secretary Wormuth's official duties are conducted at 101 Army Pentagon, Washington D.C. 20310-0101.

15.     Defendant Army Board for the Correction of Military Records is an organization of the Department of the Army within the Executive Branch of the United States.  The mailing address for the Board is 251 18th Street South, Suite 385, Arlington, Virginia 22202-3531.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the U.S. military and under the APA.  10 U.S.C. § 1210; 5 U.S.C. § 701 *et seq.*  The Court has authority to review the decision of the Board pursuant to the United States Constitution and 10 U.S.C. §§ 1552(a)(4)(B), 1553a.

17.     Plaintiff exclusively seeks declaratory and other equitable relief.  *See* 5 U.S.C. § 702.  Specifically, Plaintiff seeks orders setting aside the Army's and the Board's erroneous determination of his discharge classification, and directing the relevant authorities to correct his military record to indicate a medical retirement based on his suffering from MDD that required a rating of at least 30 percent at the time of his discharge pursuant to the applicable ratings schedule.

18.     The  Board's denial of Plaintiff's application to correct his military record to reflect a medical retirement constitutes final agency action for which there is no adequate remedy other than this declaratory and equitable relief.  *See* 5 U.S.C. § 704.

19.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because the Defendants' principal offices are located in, and their official duties are conducted within, this judicial district. Venue also is proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

20.     In accordance with 28 U.S.C. § 2501, this action is brought within six years of the Final Decision.

## RELEVANT STANDARDS

21.     The Board should have determined that the Army failed to comply with legal and regulatory requirements in effect at the time of Plaintiff's separation.  Further, the Board failed to follow binding DoD guidance promulgated for review of these kinds of cases.

### I.     Separation Laws and Regulations at Time of Discharge

22.     Chapter 61 of Title 10, United States Code establishes the process through which the Army discharges disabled service members.  The statute in force at the relevant time authorized the Secretaries within the Department of Defense, including the Secretary of the Army, to separate a member of the armed forces if the Secretary determined that the member was "unfit to perform the duties of his office, grade, rank, or rating because of physical disability incurred while" in active service.  *See* 10 U.S.C. §§ 1201, 1203 (1982).  The law also guaranteed a service member the right to "a full and fair hearing."  10 U.S.C. § 124.

23.     Department of Defense Directive 1332.18, as then in effect, made clear that "[t]he term 'physical disability' includes mental disease, *but not such inherent defects as . . . personality disorders*."  DODD 1332.18, encl. 2 (Feb. 25, 1986) at 27 (emphasis added).  "Personality disorders [were] considered to render an individual administratively unfit rather than unfit because of physical disability."  *Id.*, encl. 4 at 4-20.  The same regulation provided that "[a] service member is presumed to have been in sound physical and medical condition upon entering active service"

except with respect to impairments "noted and recorded at the time of entrance, and correspondingly that a condition "discovered after a service member enters active military service . . . is presumed to have been incurred in line of duty." *Id.* ¶ 9(a)(1)–(2).  Directive 1332.18 required that every service member subject to separation "shall be carefully counseled in clearly understandable terms concerning the significance of action being proposed" at the outset of the process and "at each subsequent stage of processing." *Id.* ¶12(a).

24.     At the time of Plaintiff's discharge, Army Regulation ("AR") 635-40 established the Department of the Army Discharge Evaluation System ("DES") under the provisions of Title 10, United States Code, Chapter 61 and Department of Defense Directive 1332.18.  AR 635-40 contained the same presumptions of fitness and service-connection as DOD 1332.18, AR 635-40 (1990) at 3-2(a)(1)–(2), and required "counseling soldiers . . . at each step in a disability evaluation," *id.* at 3-8(a).

25.     The DES consisted of several phases of evaluation and review that resulted in a final determination of physical fitness to continue Army service, entitlement to benefits, and disposition of referred service members.  When a question arose as to a soldier's ability to perform his duties because of physical disability, he was referred to a medical treatment facility ("MTF"). If it appeared that the soldier was not medically qualified to perform duty, the MTF commander referred the soldier to a medical evaluation board ("MEBD").  If the MEBD determined that the soldier did not meet retention standards, it would recommend referral of the soldier to a physical evaluation board ("PEB").  The PEB would then determine whether the soldier was fit or unfit to perform his duties, whether the disability was of a permanent nature, and whether the disability met the criteria established by law for compensation.

26.     AR 635-200 governed administrative separations, including for personality disorders.  The regulation required "adequate counseling and/or rehabilitative measures . . . before initiating action to separate a member" and required that the soldier's "counseling or personnel records must establish that the member was afforded a reasonable opportunity to overcome" any identified "deficiencies."  AR 635-200, Interim Change (Feb. 14, 1983).  It also required "[a]dequate counseling and rehabilitation measures . . . before initiating separation."  AR 635-200 (Oct. 1, 1982) at ¶ 1-17(c).  "Each counseling session will be recorded on DA Form 4856-R." Separation for personality disorder specifically required appropriate counseling.  *Id.* at ¶ 1-19.

27.     Personality disorders were classified under Chapter 5 "Separation for Convenience of the Government," which allowed administrative separation for "personality disorder (not amounting to disability (AR 635-40))."  The regulation required that "the diagnosis will have been as established by a physician trained in psychiatry and psychiatric diagnosis" and an administrative separation was "authorized only if the diagnosis conclude[d] that the disorder is so severe that the member's ability to function effectively in the military [was] *significantly impaired*."  ¶ 5-13(c) (emphasis added).  Further, "[s]eparation processing may not be initiated under this paragraph until the member has been counseled formally concerning deficiencies and has been afforded ample opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records."  ¶ 5-13(e).

28.     The 1982 revision of Army Regulation 635-200 states that a member may be separated for personality disorder that interferes with the member's duty, when so diagnosed by a medical authority.  This provision further states that "[s]eparation because of personality disorder is authorized *only* if the diagnosis concludes that the disorder is so severe that the member's ability to function effectively in the military environment is significantly impaired.  Separation for

personality order is *not appropriate* when separation is warranted under . . . AR 635-40." (emphasis added).

     29.    The applicable regulations and policies, in many relevant respects, have not significantly changed since the time of Plaintiff's discharge. The Board may, however, consider "revised policies, attitudes and changes in reviewing applications" in making its decision. *See* ABCMR Dkt. No. AR20060005917 (Nov. 16, 2006). Those changes have universally discouraged the use of "personality disorder" as a catch-all excuse for discharge.

## II.    Relevant Diagnostic Criteria

### A.  Major Depressive Disorder

     30.    The 1987 revision of the Diagnostic and Statistical Manual of Mental Disorders, third edition ("DSM-III-R") lays out the diagnostic criteria for major depression: the patient has had one or more major depressive episodes and has never had a manic episode. Major depressive episodes are characterized by "dysphoric mood, usually depression, or loss of interest or pleasure in all or almost all usual activities and pastimes. This disturbance is prominent, relatively persistent, and associated with other symptoms of the depressive syndrome" such as appetite disturbance, change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of worthlessness or guilt, difficulty concentrating or thinking, and thoughts of death or suicide or suicidal attempts.

### B.  Personality Disorder

     31.    DSM-III-R defines personality disorders as inflexible, maladaptive "enduring patterns of perceiving, relating to, and thinking about the environment and oneself . . . exhibited in a wide range of important social and personal contexts" that "cause either significant impairment in social or occupational functioning or subjective distress" and "are generally recognizable by adolescence or earlier and continue throughout most of adult life." It is further cautioned that a

diagnosis of a Personality Disorder only be made "when the characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness." AR 635-200 explicitly incorporated the medical definition of personality disorder as "described in the Diagnostic and Statistical Manual (DSM III) of Mental Disorders," characterizing this condition as "a deeply ingrained, maladaptive pattern of behavior of long duration." ¶ 5-13(a).

## FACTUAL ALLEGATIONS

### I. Plaintiff's Service-Connected Major Depressive Disorder

32.     Plaintiff enlisted in the United States Army as a wheeled vehicle repairer on February 27, 1986. On February 18, 1986, Plaintiff underwent a medical examination to determine his physical and mental fitness for enlistment. He was declared qualified for service with a psychiatric evaluation of "normal" and no indication of a personality deviation. Plaintiff re-enlisted at least once with no indication of personality order or other fitness deficiency. During his service, Plaintiff qualified expert in marksmanship and grenade, and earned a Good Conduct Medal, National Defense Service Medal, Army Service Ribbon, and Overseas Service Ribbon.

### A. Onset of MDD Symptoms

33.     The earliest evidence of Plaintiff's depressive disorder appeared about two years into his military service. As late as two and a half years after being found physically and mentally fit for enlistment, on August 9, 1988, his psychiatric evaluation during a routine medical examination was found to be normal. On November 8, 1988, Plaintiff was diagnosed with "Axis I – Adjustment Disorder with Mixed Emotional Features" and no Axis II diagnosis during an inpatient evaluation for the injury caused by his suicide gesture on November 6, 1988. On July 19, 1989 he received a diagnosis for "Marital Problems" and "Adjustment Disorder with depressed mood" when he underwent a Mental Status Evaluation for a security clearance."

34.     Plaintiff's depression was exacerbated by his squadron and his home life.   His depression was worsened by a particularly acrimonious falling out with his wife at the time, who falsely accused Plaintiff of sexually assaulting their daughter.   His unit called him "psycho."   The strap on the helmet he used in the Army had "psycho" and "sickness" written on it because those were the names he was given once everyone found out he was seeing a psychiatrist.

35.     Plaintiff's depression was reconfirmed just before his administrative separation. On October 8, 1991, a non-physician evaluator conducted a clinical interview, and Plaintiff underwent psychological testing on October 25.   This Mental Status Evaluation was at the behest of his Commander who referred him "due to concern that he might pose a suicide risk."   On November 7, 1991, Plaintiff's evaluators reported that he appeared to be suffering from depression.

### B.  Post-Separation Corroboration of MDD

36.     Plaintiff has been diagnosed with MDD consistently since his administrative separation.[1]   In 1996, Plaintiff was diagnosed with a "Major Depressive Disorder, Single Episode" after two one-hour assessment interviews the previous month.   On December 10, 1996, Plaintiff underwent a mental health evaluation that concluded Plaintiff had "major depression."   On June 18, 2013 his diagnoses for an initial treatment plan were "AXIS I – CLINICAL DISORDERS: Major Depressive Disorder" and "Axis II – PERSONALITY DISORDERS: None."   True personality disorders do not simply disappear.

37.     On August 27, 2013 the VA rated Plaintiff 50% disabled for service-connected MDD directly related to his military service.   On October 24, 2016, the VA corrected the effective date assigned to the 50% disability rating decision to an earlier date.

---

[1] DoD recognizes that "Evidence in support of relief may come from sources other than a veteran's service record."  Robert Wilkie, *Mem. for Secs. of Mil. Dep'ts* (July 25, 2018) ("Wilkie Mem.") ¶ 6(d).

II.    **The Army's separation actions were substantively incorrect and procedurally deficient.**

38.    Plaintiff was given notional separation counseling for Chapter 5-13 personality disorder on November 20, 1991.  Appended to the counseling form were "diagnostic impressions" of unknown provenance stating "Personality Disorder, Not Otherwise Specified, with Borderline and Dependent personality traits which is a type of Personality Disorder within the meaning of AR 40-501" and "Alcohol Abuse."

39.    This was the first suggestion that Plaintiff had a personality disorder, conveniently timed to coincide with his chain of command's decision to separate him.

40.    Two months later, on January 23, 1992, Plaintiff was administratively separated from the Army.  The narrative reason for separation given in the Certificate of Release or Discharge from Active Duty was "personality disorder," despite the lack of any evidence— diagnostic or otherwise—to support that determination.

41.    The evidence available at the time of Plaintiff's discharge, corroborated by evidence from his post-service treatment, shows that Plaintiff actually suffered from MDD, not a personality disorder, and thus should have been medically retired rather than administratively separated.  Furthermore, there are no "appropriate counseling or personnel records" for Plaintiff between his separation counseling and his administrative separation showing that he was "afforded ample opportunity to overcome these deficiencies" as required by AR 635-200.

III.    **The Board's Final Decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.**

42.    To rectify the Army's incorrect use of "personality disorder" as the reason for Plaintiff's separation, Plaintiff applied to the Army Board for Correction of Military Records for a correction of his military record to reflect that he was unfit for continued service and permanently medically retired for service-connected MDD with a 70% disability rating.  Plaintiff submitted this

application in February 2019.  Section 1557 of Chapter 10 of the United States Code requires the Board to dispose of 90% of applications for correction of military records within 10 months, and to render final action on those applications within 18 months of receipt.

43.     In December 2021—*34 months* after Plaintiff submitted his application—the Board mailed Plaintiff a letter asserting that it had "rendered a decision" and was granting "[p]atrial relief."  Although Plaintiff did not receive this communication until the end of the year, the letter was dated September 10, 2021.  Enclosed with the letter was a document captioned "Record of Proceedings" dated August 3, 2021.  In the Board Discussion section of the Record of Proceedings, "the Board determined partial relief was warranted.  Based on Plaintiff's lengthy period of honorable service prior to separation, the reason for the separation, and the findings of the medical advisor, the Board concluded that it was appropriate to refer Plaintiff's medical records to the Integrated Disability Evaluation System ("IDES")[2] for further evaluation to determine if a change to the applicant's narrative reason for separation was warranted."

44.     Plaintiff received another letter from the Board in March 2022.  As with the previous communication, this letter was dated months earlier—January 14, 2022.  This second letter contained a single cover page purporting to "serve[] as the Office of the Surgeon General endorsement of the opinion provided by Joanne M. Hogle, Ph.D. of the Tripler Army Medical Center, Medical Evaluation Board (MEB) section regarding concerns presented by Mr. Riggins."  Behind the single-page memorandum was the referenced "opinion," a four-page report recommending "[n]o changes to the circumstances of Mr. Riggins [*sic*] Army discharge."  The Board took no further action.

---

[2] "The IDES is a joint DoD and Department of Veterans Affairs (VA) disability evaluation process." Dep't of Veterans Affairs, *Pre-Discharge*, https://www.benefits.va.gov/predischarge/ides.asp.

**A.  The Board failed to apply appropriate diagnostic criteria as required by law.**

45.     The Board's decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence because in denying correction, it failed to follow the 1987 revision of the DSM-III-R, as required by Army regulation.  The version of Army Regulation 635-200 and Army Regulation 40-50 in effect at the time of Plaintiff's discharge required the Army was to ensure its diagnosis of personality disorder was in "consonance with" the DSM-III-R Manual, American Psychiatric Association, 1987, which defines personality disorders as inflexible, maladaptive "enduring patterns of perceiving, relating to, and thinking about the environment and oneself . . . exhibited in a wide range of important social and personal contexts" that "cause either significant impairment in social or occupational functioning or subjective distress" and "are generally recognizable by adolescence or earlier and continue throughout most of adult life."  Also relevant here is that the DSM-III-R explicitly cautioned that the diagnosis of a Personality Disorder only be made "when the characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness."

46.     Here, even the most cursory review of Plaintiff's symptoms indicates that Plaintiff did not suffer from a personality disorder as defined by the DSM-III-R.  Plaintiff entered active duty as a psychologically mature adult at age twenty-four, several years out of adolescence.  His psychiatric evaluation at the time of enlistment was "normal," with no indication of personality deviation.  Psychiatric evaluations during his service also indicated no sign of personality disorder.

47.     This absence of a personality disorder throughout Plaintiff's adolescence and first years in service runs contrary to the DSM-III-R requirement that a personality disorder be apparent during adolescence and be exhibited in a wide range of social and personal contexts.  In upholding the Army's personality disorder discharge excuse, the Board and Surgeon General failed to identify a single inflexible, maladaptive, or enduring pattern of perceiving, relating to, and thinking

about the environment and oneself.  Rather, the Board relied almost entirely on one note on the backside of a mental status evaluation, written after the separation proceedings for "personality disorder" already had begun.

48.     The record unambiguously demonstrates that Plaintiff suffers from a service-connected MDD.  Unlike personality disorders, depressive disorders are symptomatic and episodic, often featuring "the presence of sad, empty, or irritable mood, accompanied by somatic and cognitive changes that significantly affect the individual's capacity to function."  Plaintiff clearly suffered from MDD that progressively worsened throughout his service.  Throughout his service, he exhibited many of the symptoms of MDD outlined in DSM-III-R, including recurrent suicidal ideation and a suicide attempt.  In fact, he was admitted to a medical center in November 1988 following a "suicide gesture" in which he attempted to overdose on Tolectin.

49.     Throughout his service, Plaintiff's depressive episodes caused mood swings that significantly interfered with his duties.  His squadron nicknamed him "psycho" and "sickness" when they discovered he was seeing a psychiatrist.  In a November 1991 mental status evaluation, two psychologists reported that Plaintiff's commander was concerned Plaintiff might pose a suicide risk.  This report further indicated that Plaintiff experienced "chronic difficulty in forming close relationships with others, managing alcohol use, and coping with self-destructive thoughts" and appeared to be suffering from depression.

50.     The Board's decision is arbitrary, capricious, contrary to law, and unsupported by substantial evidence.  According to 32 CFR § 581.3(e), applications to the Board will be reviewed to determine whether "the preponderance of the evidence shows that an error or injustice exists." The evidence that was clearly laid out in the application presented to the Board unambiguously

shows that Plaintiff suffered from MDD, not a personality disorder, and that Plaintiff should have been medically retired accordingly.

51.     Because of the ample record evidence that Plaintiff's MDD, not a personality disorder, caused the symptoms the Army determined interfered with performance of effective duty, and the complete lack of evidence that Plaintiff ever presented a personality disorder, the Board's decision to uphold Plaintiff's administrative separation for personality disorder was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.  The Board's decision must be overturned because it "cannot be squared with the record" and "is . . . devoid of reasoned decisionmaking."  *Haselwander v. McHugh*, 774 F.3d 990, 999 (D.C. Cir. 2014).

**B. The Board failed to discharge its legal obligations.**

52.     The Board's decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence because 10 USC § 1552 says that all "corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department."  Thus, the Secretary has a duty to act through the Boards, not the surgeon general, when correcting errors or injustices and cannot delegate its authority to a non-civilian entity.  The Board "must make findings that support its decision, and those findings must be supported by substantial evidence."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

53.     The Board is required by its regulations to reach a final decision on the applications before it through a majority vote of panel members.  32 CFR § 581.3(g).  The applicable regulations and underlying statute, 10 U.S.C. § 1552, contain no provisions that authorize the Board to relinquish its responsibility to correct records to the Surgeon General, especially after determining that justice requires correction.  The "failure by the [] Board to carry out its statutory obligations and base its conclusions on the official record before it" is "arbitrary, capricious and contrary to law."  *Friedman v. United States*, 158 F. Supp. 364, 372 (Ct. Cl. 1958).  Further, "the

[] Board is arbitrary when it follows an ex parte opinion of the Surgeon General which is inaccurate and contrary to the evidence." *Hutter v. United States.*, 345 F.2d 828, 832–33 (Ct. Cl. 1965).

54.     The Board abdicated its responsibilities and acted contrary to its internal procedures and guiding regulations when it farmed out its final decision to the Surgeon General and failed to act any further.  The Board's "abdication of statutory authority" is "contrary to law when the Board did not base its conclusion on the record before it, but rather relied on the opinion" of another person or entity.  *Lyon v. United States*, No. 20-755 C, 2022 WL 2294191, at *11 (Fed. Cl. June 22, 2022).  Moreover, by taking no further action to grant Plaintiff's application for correction, and by accepting and adopting the Surgeon General's incorrect opinion, the Board's actions were arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

**C.  The Board failed to address the grounds for relief in Plaintiff's application.**

55.     Plaintiff asserted in his application that he was entitled to relief because "the Army failed to follow its own regulations for separating members on the basis of non-physical conditions."  Specifically, Plaintiff pointed to the Army's failure to (1) follow required counseling procedures before separating Plaintiff; and (2) support the supposed personality disorder conclusion with appropriate doctoral-level psychological evaluation.

56.     The Board's referral to the Surgeon General does not even purport to address these issues.  "It is well established that a military review board acts arbitrarily in failing 'to respond to arguments raised by a plaintiff, which do not appear frivolous on their face and could affect the Board's ultimate disposition.'"  *Rudo v. Geren*, 818 F. Supp. 2d 17, 25 (D.D.C. 2011).  This Court has applied this requirement when a plaintiff "specifically argued that the Army had violated its own regulations." *Tennekoon v. Fanning*, 156 F. Supp. 3d 208, 217 (D.D.C. 2016).

**D.  The Board improperly failed to refer the application into the IDES.**

57.    The Board's decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence because, despite the explicit finding that justice required referral into the IDES, the Board abdicated its responsibility to take such a step and instead "recommend[ed] that all Department of the Army records of the individual concerned be corrected by referring his records to the Office of the Surgeon General for review to determine if the disability evaluation he received from the Army accurately depicted his conditions as they existed at the time."

**E.  The Board failed to follow binding DoD Guidance.**

58.    The Board is bound by guidance from the Department of Defense, including Memoranda for Secretaries of Military Departments, respectively dated September 3, 2014 (the Hagel Memo), February 24, 2016 (the Carson Memo), and August 25, 2017 (the Kurta Memo) (together, "DoD Guidance").[3]

59.    DoD Guidance requires the Board to give "liberal consideration" to servicemembers seeking "discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions," including MDD.  This "liberal consideration" must be given to all evidence, including civilian medical opinions and the award of VA disability benefits, as well as evidence beyond treatment records, including "changes in behavior; requests for transfer to another military duty assignment; deterioration in work performance; inability of the individual to conform their behavior to the expectations of a military environment; substance abuse; episodes of depression, panic attacks, or anxiety without an identifiable cause; unexplained economic or social behavior changes; [or] relationship issues."

---

[3]    The Kurta Memo incorporates and applies the Carson and Hagel Memos to all discharge characterizations, not just Under Other Than Honorable Conditions characterization, and to "any petition seeking discharge relief," including "requests to change the narrative reason."

60.     The DoD Guidance applies to any petition seeking discharge relief, including revisions to the characterization, narrative reason, separation code, and re-enlistment code.

61.     DoD Guidance further instructs the Board that "[t]he veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service, and that the condition or experience excuses or mitigated the discharge."[4]

62.     Additionally, DoD Guidance instructs the Board that "[a] diagnosis made by a licensed psychiatrist or psychologist that [MDD] existed during military service will receive liberal consideration."  DoD Guidance also states that "conditions or experiences [such as symptoms of MDD] that may reasonably have existed at the time of discharge will be liberally considered as excusing or mitigating the discharge."

63.     DoD Guidance further dictates that "[a] determination made by the Department of Veteran Affairs (VA) that a veteran's mental health condition, . . . is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service."

64.     When the Board is reviewing a discharge revision claim "involving diagnosed, undiagnosed, or misdiagnosed TBI or mental health conditions" such as MDD, DoD Guidance forbids the Board from "condition[ing] relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case."

65.     Finally, when the record contains conflicting evidence as to the servicemember's condition, DoD Guidance requires the Board to liberally construe the evidence as supporting the diagnosis claimed by the servicemember, including MDD.

---

[4] *Accord* Wilkie Mem. at ¶ 6(f).

66.    The Board's decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence because it failed to adhere to binding DoD Guidance.  In denying Plaintiff's request for relief based on his well-documented MDD, the Board failed to (a) give liberal consideration (if any) to the numerous treating physicians and the VA that evaluated Plaintiff and found that he suffered from MDD, not a personality disorder; and (b) liberally construe the evidence in favor of a diagnosis of, and discharge due to, MDD, not a personality disorder.

**F.  The Board ignored the context of the scourge of improper "personality disorder" administrative separations.**

67.    The Surgeon General and Board both ignore the Army's well-documented and criticized practice of improperly separating soldiers for "personality disorders" in violation of the Army's own policies during the time of Plaintiff's discharge.

68.    Improper personality disorder diagnoses, in violation of the Department of Defense's (DOD) own policies and procedures, have been a catch-all discharge excuse across the armed services for many years.  As early as 2007, bills were introduced in the House and Senate that sought to put a moratorium on all personality disorder discharges until DOD conducted a review of how the policies and procedures surrounding such diagnoses were implemented on the ground.[5]  There has been extensive news coverage of various manifestations of this issue,[6] with

---

[5] *See generally* S. 1817, 110th Cong. (2007); H.R. 3167, 110th Cong. (2007).

[6] James Dao, *Branding a Soldier With 'Personality Disorder'*, N.Y. TIMES (Feb. 24, 2012), https://www.nytimes.com/2012/02/25/us/a-military-diagnosis-personality-disorder-is-challenged.html; Aina Hunter, *PTSD Soldiers Misdiagnosed: Army Said they Had Personality Disorders*, CBS NEWS (Aug. 16, 2010), https://www.cbsnews.com/news/ptsd-soldiers-misdiagnosed-army-said-they-had-personality-disorders/; *Specialist Town Takes His Case to Washington*, THE NATION, Oct. 15, 2007, at 12; *Military Bars Soldiers with 'Personality Disorders'*, NPR (Oct. 16, 2007), https://www.npr.org/templates/story/story.php?storyId=15323415; *Troop Discharges High for 'Pre-Existing' Psychiatric Disorders*, FOX NEWS (Dec. 24, 2015), https://www.foxnews.com/politics/troop-discharges-high-for-pre-existing-psychiatric-disorders.

rationales for these misdiagnoses ranging from purely financial motivations[7] to retaliation against those who report sexual misconduct.[8]  In 2012, a report by the Veterans Legal Services Clinic at Yale Law School confirmed the military's "systemic personality disorder discharge problem" through extensive analysis of documents released based on FOIA requests.[9]

69.    The Surgeon General and Board completely ignore this historical context—an Army practice that unfortunately greatly impacted Plaintiff and eventually required Pentagon and even Congressional intervention.  In accepting and adopting the Surgeon General's opinion and failing to correct Plaintiff's discharge status, the Board's actions were arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law.

* * * * *

70.    The Army's precipitous and ill-taken discharge—and the Board's refusal to recognize or correct that error—caused, and continue to cause, significant harm to Plaintiff.  The Army separated Plaintiff because it determined that his mental health symptoms left him unable to perform his duties.  But federal law, DOD and Army regulations, and the DSM-III-R all required finding that those symptoms were caused by MDD—not personality disorder.  Had Plaintiff been correctly diagnosed, he would have been entitled to medical retirement for service-connected disability under 10 U.S.C. § 1201.

---

[7] Hal Bernton, *40% of PTSD diagnoses at Madigan were reversed*, SEATTLE TIMES (Mar. 20, 2012, 9:24 PM), https://www.seattletimes.com/seattle-news/40-of-ptsd-diagnoses-at-madigan-were-reversed/.

[8] David S. Martin, *Rape victims say military labels them 'crazy'*, CNN (Apr. 14, 2012, 12:29 PM), http://www.cnn.com/2012/04/14/health/military-sexual-assaults-personality-disorder/index.html ("women in all branches of the armed forces . . . tell stories that follow a similar pattern—a sexual assault, a command dismissive of the allegations and a psychiatric discharge.").

[9] Melissa Ader et al., *Casting Troops Aside: The U.S. Military's Illegal Personality Disorder Discharge Problem,* YALE LAW SCHOOL (2012), https://law.yale.edu/sites/default/files/documents/pdf/Clinics/VLSC_CastingTroopsAside.pdf.

71.     The Board should have corrected this injustice, and the Court should now require it to do so.

## COUNT I

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701 *et seq.***

72.     Plaintiff hereby incorporates the preceding paragraphs as if fully set forth herein.

73.     Plaintiff has exhausted his administrative remedies at the Army

74.     The Board's decision to uphold the administrative separation of Plaintiff for "personality disorder" was arbitrary, capricious,  unsupported by substantial evidence, and contrary to law.

75.     The Board erred by: (1) failing to correct, without explanation, an identified injustice; (2) abdicating its responsibility to correct Plaintiff's record to the Surgeon General; (3) not using DSM-III-R to explain and evaluate Plaintiff's in-service mental health diagnosis; (4) failing to apply liberal consideration as required; and (5) failing to consider the historical context of Plaintiff's separation for personality disorder.

76.     The Board's failure to address the grounds for relief raised in Plaintiff's application was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law.

77.     The Board's erroneous Final Decision has deprived Plaintiff of his military medical retirement.

## PRAYER FOR RELIEF

Plaintiff Riggins respectfully requests the following relief:

(A) An order setting aside the Board's Final Decision as arbitrary, capricious, unsupported by substantial evidence, and contrary to law under 5 U.S.C. § 701 *et seq.*;

(B) An order requiring the Board to correct Plaintiff's record to indicate that, at the time of Plaintiff's discharge, Plaintiff suffered from service-connected Major Depressive Disorder, and not a personality disorder, as a result of which Plaintiff was at least 30% disabled and is therefore entitled to medical retirement;

(C) An order awarding Plaintiff costs and attorneys' fees; and

(D) Any other relief to which Plaintiff is justly entitled at law or equity.

Respectfully submitted,

/s/ S. Lee Whitesell_____
HOGAN LOVELLS US LLP

**E. Tazewell Ellett\***
D.C. Bar No. 963074
tazewell.ellett@hoganlovells.com
**Rachel Buff\***
D.C. Bar No. 1781568
rachel.buff@hoganlovells.com
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

NATIONAL VETERANS LEGAL
SERVICES PROGRAM

**Esther Leibfarth**
D.C. Bar No. 1016515
esther@nvlsp.org
**Rochelle Bobroff**
D.C. Bar No. 420892
rochelle@nvlsp.org
1600 K Street, NW, Suite 500
Washington, DC 20006
Tel.: (202) 621-5677
Fax: (202) 328-0063

**S. Lee Whitesell**
Texas Bar No. 24093356
D.D.C. Bar ID: TX0052
lee.whitesell@hoganlovells.com
609 Main Street
Houston, TX 77002
Tel.: (713) 632-1400
Fax: (713) 632-1401

*\* Appearing pursuant to LCvR 83.2(f)*

***Attorneys for Plaintiff***